UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNISE SAMUELS NOEL,

                     Plaintiff,                    Case No. 19-10244

v.                                            Paul D. Borman
                                            United States District Judge

MACARTHUR CORPORATION and
JACK VAN DEN BOOGAART,

                     Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 15)

This case involves Plaintiff Jennise Samuels Noel's claims against her former employer, Defendant MacArthur Corporation, and her former supervisor, Defendant Jack van den Boogaart, for interference and retaliation in violation of the Family and Medical Leave Act ("FMLA") and discrimination and failure to accommodate in violation of the Americans with Disabilities Act ("ADA"). According to Defendants, after receiving Plaintiff's notice that she was looking for other employment, Defendants recruited and hired her replacement, and then informed Plaintiff that her employment would end after the new hire's training period. Plaintiff disputes that she gave notice of her resignation and claims instead that

Defendants refused to reinstate her to her job upon expiration of her FMLA leave, and instead terminated her employment in violation of the FMLA and ADA.

Now before the Court is Defendants' Motion for Summary Judgment, in which they argue that Plaintiff's FMLA and ADA claims are without merit and should be dismissed as a matter of law, and that Plaintiff should be precluded from seeking economic damages based on her representation to the Social Security Administration that she was totally disabled. (ECF No. 15.) Plaintiff has responded to this motion (ECF No. 17) and Defendants have replied (ECF No. 18). The motion is thus fully briefed and ready for adjudication. The Court has determined, pursuant to E.D. Mich. L.R. 7.1(f), that a hearing is not necessary and decides the matter on the written submissions. For the reasons that follow, the Court GRANTS Defendants' Motion for Summary Judgment.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Background

#### 1.     Plaintiff's Employment with MacArthur

Plaintiff began her employment with MacArthur as an Outside Sales representative in 2005. (ECF No. 15-2, Plaintiff Deposition Tr. at p. 19, PgID 131.) MacArthur subsequently reorganized the sales team, and Plaintiff agreed to take on the position of Inside Sales representative. (*Id.* at pp. 23-25, PgID 132.) MacArthur

2

had two Inside Sales representatives, including Plaintiff. (*Id.* at p. 26, PgID 133.) The Inside Sales representatives were responsible for, among other things, supporting customer inquiries or concerns, launching the quote process, and assisting the Outside Sales team with the team's larger, targeted customer accounts. (*Id.* at p. 24, PgID 132; ECF No. 15-3, Job Description.)

### 2.      Plaintiff's Modified Work Schedule

In 2011, Plaintiff requested a modified work schedule because of her treatment for lupus, wherein she worked from home two days a week on Mondays and Fridays. (Plaintiff Dep. at pp. 57-59, 61-63, PgID 140-42.) Plaintiff testified that she was diagnosed with lupus in 2010, and with necrotizing myopathy in late 2011 or early 2012. (*Id.* at p. 53, PgID 139.) She described necrotizing myopathy as causing decreased muscle function in her arms and legs and that she is sometimes unable to walk, and she described lupus as causing decreased kidney function. (*Id.* at pp. 54-56, PgID 140.) The modified work schedule was initially intended to be reevaluated every six months, but it was continued without re-evaluation throughout Plaintiff's employment, until her termination in 2018. (*Id.* at pp. 63-64, PgID 142.)

### 3.      Defendant Jack van den Boogaart Re-Hired at MacArthur

In October 2016, Defendant Jack van den Boogaart returned to MacArthur (after leaving in 2010) as its Vice President – Sales and Marketing, to oversee

Outside and Inside Sales.  (ECF No. 15-4, Jack van den Boogaart Deposition Tr. at pp. 4, 35, PgID 181, 189.)  Plaintiff and van den Boogaart met in January 2017 to discuss her annual performance evaluation, in accordance with MacArthur's annual review practice, in which the Company evaluates employee compensation at the end of January based on the prior year's performance.  (*Id.* at p. 22, PgID 186.)  The budget is then set for that year taking into account any compensation adjustments, and those adjustments go into effect in February.  (*Id.*)  Plaintiff received a good evaluation in January 2017 and a salary increase, which she accepted without any objection or attempt to negotiate a higher salary.  (*Id.* at pp. 36, 38, PgID 189-90.)

In or around February or March of 2017, van den Boogaart inquired of Wendi Lloyd, MacArthur's Controller, regarding the reason for Plaintiff's modified work schedule.  (ECF No. 15-5, Wendi Lloyd Deposition Tr. at p. 20, PgID 201 (stating she became aware of the reason for Plaintiff's accommodated work schedule "[p]robably when Jack asked me if there was a documented reason as to why she [Jennise] had Mondays and Fridays from home when no other employee did.").)  Lloyd looked through Plaintiff's records and found that Plaintiff had been granted two temporary, 60-day leaves, but found "nothing in the file that would indicate that that was in any way part of her current arrangement."  (*Id*. at p. 19, PgID 201.)  Lloyd also discovered that Plaintiff "had had FMLA previously, and that she'd had a

diagnosis of lupus." (*Id.*)  Van den Boogaart testified that he did not become aware of Plaintiff's medical condition (lupus) until February 2017, when she did not feel well during one of their meetings and volunteered to him that she had lupus and her medicine caused her not to feel well.  (van den Boogaart Dep. at pp. 40-41, PgID 190.)

### 4.    Plaintiff's Request for a Salary Increase

In or around May 2017, Plaintiff informed van den Boogaart that she believed her compensation should be higher, complaining that she had been performing more work because of the two Outside Sales Representatives in Mexico. (van den Boogaart Dep. at pp. 22, 35-36, PgID 186, 189.)  Specifically, Plaintiff complained that she was having to take a lead on those representatives' accounts and that they were not attending customer meetings or completing quotes and requests from customers.  (Plaintiff Dep. at pp. 79-80, PgID 146; van den Boogaart Dep. at p. 46, PgID 192.)

In the course of assessing Plaintiff's compensation and determining whether the Company could justify a pay increase outside of the normal performance assessment cycle (in January), and "brainstorming" whether Plaintiff could take on additional duties, van den Boogaart asked Plaintiff about the duration of her "modified work schedule."  (van den Boogaart Dep. at p. 48, PgID 192; Plaintiff

Dep. at pp. 98-99, PgID 151 (stating van den Boogaart asked her "when is your accommodation going to end?").)  Van den Boogaart also asked Plaintiff to send him an outline of the additional duties she was doing "above or outside of the scope of [her] work" by May 5, 2017 for consideration regarding a pay increase.  (van den Boogaart Dep. at p. 49, PgID 192.)

### 5.  Plaintiff Reaches Her "Breaking Point" in May 2017

Plaintiff emailed van den Boogaart on May 5, 2017, stating that she had "reached [her] breaking point" and that :

> … **it seems that the time has come and I need to seriously consider other employment**.  It's not just the fact that the compensation does not match the duties and workload but it's more that I am always the first in mind when there is a vacancy that needs to be filled temporarily or asked to do tasks that others cannot do even when it's essential to their core job function.  There certainly has to be some value in my ability to step into those roles and yet I find myself having to overly justify a request for a salary increase.

(ECF No. 15-6, 5/5/17 Plaintiff Email, PgID 212 (emphasis added).)  She continued that she "understand[s] [her] schedule accommodation to be a concern" but "it seems time to explore other opportunities" and that she will "be sure to let you know as soon as I am able to make anything official."  (*Id.*)  Van den Boogaart testified with regard to Plaintiff's modified work schedule, however, that no employees complained about Plaintiff's modified work schedule and that Plaintiff sufficiently completed her work with that schedule, and that he in fact gave Plaintiff good

6

evaluations for her performance in 2016 and 2017.  (van den Boogaart Dep. at pp. 36-37, 42-43, PgID 189, 191.)

Van den Boogaart approached Lloyd about Plaintiff's compensation.  (Lloyd Dep. at p. 20, PgID 201.)  Lloyd served as the head of human resources, accounting and information technology.  (*Id.* at pp. 4-5, PgID 197.)  Lloyd researched the market salary range for Plaintiff's position and provided that information to van den Boogaart.  (*Id.* at p. 19, PgID 201.)  Lloyd explained that MacArthur aimed to have salaries fall in the median range to remain competitive, and that the median compensation for Plaintiff's position was $48,000, with a low of $36,000 and a high of $63,000.  (*Id.* at p. 33, PgID 204.)  Lloyd found that Plaintiff's salary of around $46,000 met the median.  (*Id.*)

Van den Boogaart then met with Plaintiff on May 9, 2017, and told her that her compensation was appropriate and that it would not be changed at that time, "outside of [MacArthur's] normal process."  (ECF No. 15-7, 2/2/18 van den Boogaart Letter, PgID 215.)

### 6.   Plaintiff's May 25, 2017 "Confirmation" of Intent to Leave

Plaintiff and van den Boogaart had a meeting on May 25, 2017, during which, according to van den Boogaart, Plaintiff confirmed her decision to leave MacArthur. (van den Boogaart Dep. at pp. 8-9, PgID 182.)  Van den Boogaart asked Plaintiff

whether she would be willing to accept a retention bonus to stay through the end of 2017 while the Company recruited, hired and onboarded a replacement, but Plaintiff rejected that offer even before a specific amount could be discussed.  (*Id.*; 2/2/18 van den Boogaart Letter, PgID 215; Plaintiff Dep. at pp. 124-25, 126-27, PgID 157-58.)  They also discussed a recommendation letter for Plaintiff and assistance with her job search.  (2/2/18 van den Boogaart Letter, PgID 215.)

### 7.   Plaintiff's June 14, 2017 Meeting with Lloyd

Van den Boogaart told Lloyd that Plaintiff intended to leave MacArthur. (Lloyd Dep. at p. 20, PgID 201.)  Lloyd testified that she was shocked and that her "mouth hit the floor" and she immediately contacted Plaintiff to set up a meeting with her.  (*Id.*)

Lloyd and Plaintiff met on June 14, 2017 to discuss Plaintiff's intentions. (Lloyd Dep. at pp. 20-21, PgID 201.)  Lloyd asked Plaintiff if she was looking for other opportunities, and Plaintiff responded "yes."  (*Id.*)  Lloyd inquired why, and Plaintiff responded that she felt "overburdened" with mistakes from the Outside Sales Representatives in Mexico.  (*Id.*)  Although Lloyd could not expressly tell Plaintiff at that time (because of confidentiality concerns), van den Boogaart was in the process of terminating the relationship with the head of Outside Sales in Mexico to address some of the issues Plaintiff raised and that van den Boogaart also

8

separately observed.  (van den Boogaart Dep. at pp. 46-47, PgID 192; Lloyd Dep. at

p. 38, PgID 206.)  Lloyd, however, did tell Plaintiff, "if you hold on, your situation

may improve."  (Lloyd Dep. at p. 38, PgID 206.)  Plaintiff responded that it was "too

late."  (*Id.*)

Lloyd then informed Plaintiff that if she intended to leave the company,

MacArthur would have to begin looking for a replacement candidate because it

typically took the company six months to recruit, interview and hire a candidate.  (*Id.*

at pp. 22-23, PgID 202.)  Specifically, Lloyd testified:

> And I said, "Just so you know, once you tell me you're looking for
> another position, I have to step in and protect MacArthur because
> there's only limited resources that we have, and we can't be without the
> services.  And it takes me six months to get somebody hired in, because
> the bar is high.  And I just want to be very, very clear that you
> understand I can't have two people in the same position.  There can
> only be one. So if I hire somebody to replace you, you will have to be
> gone."
>
> And her [Plaintiff's] response, which she repeated at several other
> meetings, was MacArthur has to do what MacArthur has to do.
>
> And I said, "I'm telling you what is going to happen.  I want you to
> understand that."
>
> And she said, "Okay."

(Lloyd Dep. at pp. 22-23, PgID 202.)  Lloyd also offered, in response to Plaintiff's

concerns about her resume and interview skills, to review Plaintiff's resume, provide

her own resume as a sample, and set up mock interviews for Plaintiff. (*Id.* at pp. 23-24, PgID 202; Plaintiff Dep. at p. 70, PgID 144.)

Lloyd testified that it was her typical practice, when meeting with employees to discuss personnel issues, to document the meetings. (Lloyd Dep. at p. 20, PgID 201.)   Consistent with that practice, Lloyd created a list of "talking points" in advance of her June 14, 2017 meeting with Plaintiff.   (ECF No. 15-8, 6/14/17 Talking Points, PgID 219-20.)   At the conclusion of the meeting, Lloyd asked Plaintiff to sign the summary, which she did. (*Id.*) That summary provided, in part:

> Meeting with Jennise regarding notice to Jack of intent to seek other employment
> Dated:  ___6-14-17___ .
>
> 1. On May 5, 2017 Jennise sent email to supervisor that she was giving "heads up" she will be leaving position.
> 2. Jack gave verbal offer of a retention bonus to stay until year end which Jennise declined.
> 3. Jennise gave no time line to remain in her position with Mac Arthur.
>
> Clarifications:
>
> "it seems that the time has come and I need to seriously consider other employment"
>
>                                  * * *
>
> "overly justify a salary increase"
>
> 1. Mac Arthur annually researches each company position against market wages to verify we are in the appropriate wage brackets.
> 2. Data used for 2017 wage bracket:
>                          *** [Wage bracket information omitted]***
> 3. Wage for Jennise falls in the median range above

10

* * *

Mac Arthur Corporation has a position in which Jennise is now the incumbent. By giving notice of seeking other employment prior to the end of 2017, Jennise understands she is giving notice of her ~~intention to quit~~ [intention to look elsewhere] her position and the Company will begin the search for a replacement as of today. She also understands that, with the exception of an initial training period, the company cannot be expected to maintain two people in the same job opening and we will accept her resignation at that time. The initial training period will not exceed 90 days from the start date of a replacement.

Additional Comments:

> letting Jack know she is not happy in current position
> needs more personal satisfaction
> understands Mac Arthur position above.

These notes are accurate and complete for the meeting between Jennise and Wendi (HR) on the date stated above. [Signature omitted.]

(*Id.* (some handwritten notations omitted).)  Lloyd handwrote all the notes on this document, with the exception of the notation where Plaintiff crossed out the phrase "intention to quit" and handwrote in "intention to look elsewhere." (*Id.*; Lloyd Dep. at p. 35, PgID 205.)  Lloyd testified that she told Plaintiff: "You understand those are the same things to me.  Intending to look elsewhere and … 'Intention to quit' are the same things to me, and I will take action based on my understanding." (Lloyd Dep. at p. 36, PgID 205.)  Lloyd also noted on her talking points memo that Plaintiff had "no concrete plans" regarding how long she would remain at MacArthur. (6/14/17 Talking Points, PgID 219-20.)

11

### 8.     Plaintiff's Replacement is Hired

After this meeting, MacArthur posted for the Inside Sales position.  (van den Boogaart Dep. at p. 42, PgID 191.)  MacArthur subsequently identified a suitable replacement after months of recruiting, and van den Boogaart met with Plaintiff on October 24, 2017 to discuss that candidate, before an offer was made to him.  (*Id.*)  According to van den Boogaart, he again asked Plaintiff whether she still intended to leave the company, and she responded "yes."  (2/2/18 van den Boogaart Letter, PgID 215-16.)  Plaintiff, however, testified that she repeatedly stated that she had no intention to quit.  (Plaintiff Dep. at pp. 143-44, PgID 162.)  Van den Boogaart and Plaintiff then discussed a transition plan for the new candidate, and van den Boogaart proposed April 1, 2018 as the end date for the transition and training period for the new hire, as well as the end date for Plaintiff's employment, unless she found another job sooner.  (2/2/18 van den Boogaart Letter, PgID 215-16; Plaintiff Dep. at p. 144, PgID 162 (recalling van den Boogaart telling her the proposed end date for her employment would be April 1, 2018).)

MacArthur made an offer of employment to Plaintiff's replacement on October 25, 2017.  (2/2/18 van den Boogaart Letter, PgID 216.)  The Court finds it significant, that on November 5, 2017, Plaintiff provided van den Boogaart an "on-boarding plan" for "John," her replacement, outlining the plan for her to train him

12

before she left the Company.  (ECF No. 15-9, 11/5/17 On-Boarding Plan for Replacement, PgID 222-23; Plaintiff Dep. at pp. 146-47, PgID 163 (stating that she created the plan for "John," her replacement); van den Boogaart Dep. at pp. 26-27, PgID 187.)

At the end of December 2017, during the "year-end process" and when it became clear that the new hire would work out, Lloyd began preparing a transition plan for Plaintiff's end of employment, which included a description of her duties and the April 1, 2018 end date for her employment (although Lloyd did not present this plan to Plaintiff until January 2018).  (Lloyd Dep. at pp. 24-25, PgID 202; see ECF No. 15-10, 1/11/18 Transition Plan, PgID 225.)

### 9.    Possible Job Transfer

According to Plaintiff, at around the same time van den Boogaart informed her about hiring her replacement, he also informed her about another position that might become available that she may be interested in.  (Plaintiff Dep. at pp. 137-39, PgID 160-61.)  Plaintiff claimed that he told her another employee, co-owner Nicole Barrett, was going to be leaving her sales/marketing job at the end of the year and he talked to Plaintiff about taking over Barrett's duties.  (*Id.*)  Plaintiff does not recall whether the position would be permanent or an interim position.  (*Id.*) She testified that van den Boogaart said this information could not be made public at that time

13

because Barrett's departure had not yet been announced, but that once it was their discussions would move forward.  (*Id.*)  Plaintiff however never transitioned into that position.

Defendants dispute that there was a marketing sales coordinator position that Plaintiff could have transitioned into.  (Defs.' Reply at p. 3, PgID 500.)  Rather, van den Boogaart testified that it was announced in the end of December 2017 that Barrett was going to be taking some other activities outside of the organization, and that the marketing activity that she managed would be assumed by van den Boogaart.  (Van den Boogaart Dep. at p. 33, PgID 188.)  Defendants claim that van den Boogaart did not learn of Barrett's decision to stop performing certain tasks until the end of November of 2017, after Plaintiff's replacement was hired.  (*Id.*; Defs.' Reply at pp. 3-4, PgID 500-01, citing ECF No 18-2, 12/4/17 Christie Wong Barrett Email to van den Boogaart.)  He asserts he never offered those job responsibilities to Plaintiff, and the first time he heard Plaintiff's claim that she was offered the position was in the January 16th meeting with Plaintiff.  (van den Boogaart Dep. at pp. 33-34, PgID 188-89.)

### 10.   Plaintiff's January 10, 2018 Request to Work Remotely from Ann Arbor

On or around January 10, 2018, Plaintiff informed van den Boogaart that she would be working remotely from Ann Arbor every other Friday for treatments and

14

that she would be unavailable during the one-hour treatments, but that she otherwise would continuing her schedule of working remotely on Mondays and Fridays. (Plaintiff Dep. at pp. 149-52, PgID 163-64.) Van den Boogaart approved this request and only asked that Plaintiff let him know her schedule. (*Id.*) Lloyd was not part of this conversation and Plaintiff does not know whether Lloyd knew about this accommodation. (*Id.*)

### 11.    January 11, 2018 Transition Plan and Follow-up Meetings

The next day, on January 11, 2018, Lloyd presented Plaintiff with the written transition plan. (1/11/18 Transition Plan, PgID 225; Lloyd Dep. at pp. 25-26, PgID 202-03.) When she did so, Plaintiff "exploded" and said that she was not resigning. (Lloyd Dep. at p. 26, PgID 203.)

Plaintiff sent an email to Lloyd the next day to "address a few statements that are not accurate." (ECF No. 17-5, 1/12/18 Plaintiff Email, PgID 327.) Specifically, Plaintiff stated that her May 5, 2017 email to van den Boogaart "was to let him know that I could no longer carry the job responsibilities for Carlos, Antonio and myself without proper compensation" but that "at no time did I 'give notice'" and that "at that time, my heads up was not official." (*Id.*) She stated that she again noted on the June 14, 2017 Talking Points document that she "had not and was not quitting,"

that she "had no plan," and that she "just wanted to be compensated for the work [she] was doing." (*Id.*)

On January 16, 2018, Lloyd, van den Boogaart, and Plaintiff met to discuss the issues in Plaintiff's January 12th email. (Lloyd Dep. at p. 26, PgID 203.) Lloyd explained to Plaintiff that the Company could not support two people in the same position and asked her to provide a proposal of how MacArthur could retain her, stating "Jennise, I can't go forward if you don't give me a document that says, 'This is what I'm going to do. This is what I want to do. This is what I'm qualified to do with this company. Here's where I think I could be of value.' Because I [Lloyd] had no position to offer her." (Lloyd Dep. at pp. 26-27, PgID 203.)

Lloyd followed up that meeting with an email to van den Boogaart and Plaintiff documenting the conversation. (ECF No. 15-11, 1/16/18 Lloyd Email, PgID 231-32.) That email noted that Plaintiff acknowledged her prior conversations and meetings with van den Boogaart and Lloyd, but she stated that "[s]he was not resigning," "MacArthur needs to do what they need to do," and that "[h]er reason for sending the May 5th email was to document her reaching the breaking point on doing tasks not specific to her job scope without additional compensation." (*Id.*) That email acknowledged that "[a]ll three parties agree there is no common understanding of Jennise's intentions." (*Id.*) The email concluded that:

16

> Jennise was asked if she wanted to stay a member of the Mac Arthur
> sales team or if she wanted to pursue other opportunities.  She was told
> the company would support her with either choice but needed a clear,
> documented plan of moving forward from Jennise specifically outlining
> her intentions and how Mac Arthur could support her with her choice.

(*Id.*)  "A date of January 18th was set for a second meeting to review Jennise's

decisions." (*Id.*)

On January 18, 2018, Plaintiff responded to Lloyd's January 16th email.

(ECF No. 15-11, 1/18/18 Plaintiff Email, PgID 228-30.)  She reiterated that she

never had an intention to resign or quit, but that she instead intended to "continue

coming to work and providing the same level of service that [she] ha[s] for the past

13+ years."  (*Id.*)  In response to the Company's query if she wanted to stay a

member of MacArthur, Plaintiff wrote: "My position is that I plan to continue

coming to work and providing the same level of quality that I have always provided.

It is unclear of what additional detail, plan or documentation is needed." (*Id.*)  She

stated that when she had asked for a salary adjustment, she was asked how long her

accommodated schedule would be needed and that she received a letter "one day

after informing the company that [she] would be undergoing chemo treatments,  that

[she] would resign April 1, 2018." (*Id.*)  She also alleged that she "ha[s] encountered

harassment here before that was motivated by my health issues and I was retaliated

against with an unfavorable letter that was placed in my file.  At that time, I did not

file any formal complaints with an agency who governs such actions but I have decided to file a formal complaint with the Michigan Department of Civil Rights." (*Id.*)

On January 23, 2018, Lloyd met with Plaintiff, while van den Boogaart attended via telephone, to discuss the transition plan and whether Plaintiff had a proposal to present. (Lloyd Dep. at pp. 28-29, PgID 203.) Plaintiff then sent an email to Lloyd and van den Boogaart later that same day "summarize[ing]" the meeting. (ECF No. 15-11, 1/23/18 Email, PgID 227-28.) Plaintiff stated that, contrary to Lloyd's assertion that Plaintiff failed to provide a detailed proposal, she previously responded on January 18th that it is her "plan to continue coming to work and providing the same level of quality that [she] ha[s] always provided." (*Id.*) She noted that:

> Wendi stated that Jennise had not completed the task of providing a detailed plan of her intentions and confirmed that as a result **Mac Arthur will move to terminate Jennise's employment on April 1, 2018**.

(*Id.* (emphasis added).) Plaintiff again complained of harassment, retaliation and discrimination based on her health and disability. (*Id.*)

Lloyd testified that she asked Plaintiff to document her claims, but she never did so and instead made vague statements and referred to prior emails. (Lloyd Dep.

18

at pp. 45-46, PgID 207-08.)   Lloyd concluded that Plaintiff's claims were unsubstantiated.  (*Id.* at pp. 46-46, PgID 208.)

> **12. FMLA Leave Offered to Plaintiff on January 25, 2018 and Plaintiff Takes FMLA Leave from January 26 to April 16, 2018**

On January 24 and 25, 2018, Plaintiff called in sick.  (Lloyd Dep. at p. 29, PgID 203.)  MacArthur proactively offered Plaintiff FMLA leave on January 25, 2018 after she "informed" it that she "may need leave" under the FMLA.  (ECF No. 15-12, 1/25/18 Kim Edwards Email, PgID 234-35; Plaintiff Dep. at p. 175, PgID 170.)  Plaintiff submitted her FMLA paperwork on January 29, 2018, in which her neurologist indicated that she needed leave from January 26, 2018 through April 16, 2018.   (ECF No. 15-15, FMLA Leave Paperwork, PgID 265-69.)   MacArthur approved the leave.  (Lloyd Dep. at p. 16, PgID 200.)

> **13. Subsequent Communications and Plaintiff's Termination on April 17, 2018**

On February 2, 2018, van den Boogaart sent a letter to Plaintiff outlining their communications from May 2017 to present regarding Plaintiff's decision to look elsewhere and the hiring of her replacement, in response to Plaintiff's January 23, 2018 email "in which you claim that the decision to end your employment is based on harassment and retaliation."  (2/2/18 Letter, PgID 215-17.)  The letter disputed that any employment decisions were based on discrimination or retaliation, and

stated that Plaintiff was provided with numerous opportunities to change her mind and commit to staying at the company, and that the April 1st termination date was set during the October 24, 2017 meeting "and has never changed." (*Id.*)  The letter concluded that because Plaintiff's FMLA leave was approved through April 16, 2018, her separation date would be extended to April 17, 2018.  (*Id.*)

Plaintiff sent an email to MacArthur on April 10, 2018, stating that she is "scheduled to return to work" on "Monday [the] 16th," but that she "received notification that [her] employment will be terminated on April 17th."  (ECF No. 15-16, Email chain, PgID 274.)  She then incongruously stated "I assume I should resume the same schedule prior to my FMLA and will be working remotely Monday the 16th but I don't have access to anything since I started FMLA.  So please let me know if I am expected to come into the office on Tuesday the 17th for any reason to be in compliance with the return to work after FMLA."  (*Id.*)

Kim Edwards responded on April 13, 2018 that, as stated in van den Boogaart's February 2, 2018 letter, "the termination of your employment will coincide with the end of your leave," and that if Plaintiff is released to return to work on April 16th, her employment will end that day.  (*Id.* at PgID 273.)  Edwards confirmed on April 18, 2018 that if Plaintiff's leave ends later than April 16, per the February 2nd letter from van den Boogaart, her separation date would "be extended

20

until such time as [her] leave ends." (*Id.* at PgID 272.) All of this occurred well after she had been informed that the Company had hired a replacement for Plaintiff because she had informed the Company that she intended to seek other employment.

Plaintiff's employment was terminated on April 17, 2018.

### 14.    Plaintiff Applies for Social Security Disability Benefits

After her last day worked, Plaintiff received short-term disability benefits until they were exhausted, and she then received long-term benefits because she could not work, at least through the date of her deposition. (Plaintiff Dep. at pp. 190-91, PgID 174.)

Plaintiff applied for Social Security Disability Insurance ("SSDI") benefits on December 26, 2018, and represented that she became disabled on January 26, 2018 – her last day worked at MacArthur. (ECF No. 15-13, SSDI Application, PgID 237-39.) She stated that her injury, illness or condition "was not related to work." (*Id.*) Her application for benefits was denied. (Plaintiff Dep. at p. 191, PgID 174.) Plaintiff appealed that denial. (*Id.* at pp. 193-94, PgID 174-75.)

### B.    Procedural History

On January 24, 2019, this case was removed to this Court from the Genesee County Circuit Court. (ECF No. 1, Notice of Removal.) Plaintiff alleges claims against her former employer and her former supervisor for interference and

21

retaliation in violation of the FMLA and against her former employer only for discrimination in violation of the ADA. (ECF No. 1-1, Compl.) Specifically, Plaintiff claims that Defendants interfered with her FMLA rights by failing to return her to her same or an equivalent position following her FMLA leave, and terminated her employment before the expiration of her FMLA leave. (*Id.* Count I, ¶¶ 26-44, PgID 10-12.) She also claim that Defendants retaliated against her in violation of the FMLA by failing to restore her to her previous position or an equivalent position and by terminating her employment. (*Id.* Count II, ¶¶ 45-47, PgID 12-13.) Finally, Plaintiff claims that Defendant MacArthur violated the ADA by refusing to honor doctor-imposed limitations/restrictions for Plaintiff, refusing to accommodate Plaintiff, refusing to place Plaintiff into available jobs she was capable of doing, and terminating her employment. (*Id.* Count III, ¶¶ 48-55, PgID 13-14.) Plaintiff seeks compensatory, liquidated and punitive damages as well as equitable relief, including reinstating her to an appropriate position with Defendant MacArthur. (*Id.* PgID 15.)

On February 3, 2020, Defendants filed their motion for summary judgment, arguing that Plaintiff's FMLA interference and retaliation claims, based solely on her claims that she was not returned to her position after her leave and her employment ended when her leave ended, fail because her end of employment was agreed to and planned well in advance of her FMLA leave. (ECF No. 15, Defs.'

Mot. at pp. 16-19, PgID 113-16.)  Thus, Plaintiff cannot point to any evidence that Defendants interfered with her rights under the FMLA and she is unable to establish a causal connection between her end of employment and her FMLA leave.  (*Id.*) Defendants also argue that Plaintiff's ADA discrimination and failure to accommodate claims against MacArthur fail because Plaintiff cannot establish a prima facie case of disability discrimination, she has no evidence of pretext to overcome MacArthur's legitimate, non-discriminatory business reason, and Plaintiff cannot establish a prima facie case of failure to accommodate.  (*Id.* at pp. 19-23, PgID 116-20.)  Finally, Defendants argue that Plaintiff's alleged economic damages should be precluded because she represented to the Social Security Administration ("SSA") that she is disabled and unable to work after January 25, 2018.  (*Id.* at pp. 23-24, PgID 120-21.)

Plaintiff responded to Defendants' motion on February 20, 2020, asserting that Defendants are not entitled to summary judgment on her FMLA interference claim because it is undisputed that her employment was terminated when her FMLA leave ended, and thus she was never returned to the same or an equivalent position. (ECF No. 17, Pl.'s Resp. at pp. 10-12, PgID 291-93.)  She further contends that she has established a causal connection supporting her FMLA retaliation claim because her employment was terminated at the exact same time her FMLA leave expired,

and Defendants demonstrated displeasure and/or anger in Plaintiff's taking FMLA leave.  (*Id.* at pp. 13-17, PgID 294-98.)  She asserts that there is a dispute of material fact as to whether she resigned.  (*Id.*)  Finally, Plaintiff argues that Defendant MacArthur terminated Plaintiff instead of allowing her to continue working with an accommodation, as it had allowed for the prior six years.  (*Id.* at pp. 17-22, PgID 298-303.)  She further contends that the Sixth Circuit has stated that it is not dispositive that Plaintiff has a claim for ADA violations while she also has an application for SSDI benefits stating that she is "unable to work," and that she only applied for disability benefits because her long-term disability carrier required her to do so.  (*Id.*)  She concludes that material factual disputes exist as to whether she resigned and whether she trained her replacement because she was leaving or so she could take another job with the company.  (*Id.* at p. 22, PgID 303.)

Defendants filed a reply brief on March 5, 2020, characterizing this matter as a case of "buyer's remorse."  (ECF No. 18, Defs.' Reply, at p. 1, PgID 498.) Defendants argue that the unrebutted evidence shows that the decision to terminate Plaintiff's employment predated her January 26, 2018 request for FMLA leave, and thus MacArthur was not required to reinstate Plaintiff when her leave ended.  (*Id.* at pp. 1-2, PgID 498-99.)  Defendants further assert that Plaintiff's modified work schedule continued until her FMLA leave, and thus her "failure to accommodate"

claim fails, and that she is not a "qualified individual with a disability" under the ADA because Plaintiff repeatedly made representations to the SSA that she was disabled and unable to work. (*Id.* at pp. 3-7, PgID 500-04.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a

preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).  Instead, "the non-moving party must be able to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). "'The central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010) (quoting *In re Calumet Farm, Inc.*, 398 F.3d 555, 558 (6th Cir. 2005)). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

### III.   ANALYSIS

**A.   Plaintiff's FMLA Interference and Retaliation Claims Against MacArthur and van den Boogaart**

Plaintiff alleges claims against both Defendants for violation of the Family and Medical Leave Act ("FMLA").  The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," or to retaliate or discriminate against an employee exercising FMLA rights.  29 U.S.C. § 2615(a)(1)-(2).  The Sixth Circuit recognizes two distinct types of claims or theories of liability for FMLA wrongdoing: (1) the "entitlement" or "interference" theory, which prohibits an employer from interfering with an employee's exercise of her FMLA rights or wrongfully denying those rights and requires the employer to restore the employee to the same or an equivalent position upon her return from FMLA leave; and (2) the "retaliation" theory, which prohibits an employer from taking any adverse action against an employee for exercising or attempting to exercise her rights under the Act. *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).  "A plaintiff proceeding under a retaliation theory must show discriminatory or retaliatory intent, whereas a plaintiff alleging interference need not prove any unlawful intent on the part of his employer."  *Tennial v. United States Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016).

27

### 1.    FMLA Interference Claim

To establish a claim for interference under the FMLA, Plaintiff must demonstrate that (1) she is an eligible employee, (2) Defendant is an employer as defined under the FMLA, (3) Plaintiff was entitled to leave under the FMLA, (4) Plaintiff gave Defendant notice of her intention to take leave, and (5) Defendant denied Plaintiff FMLA benefits to which she was entitled. *Tennial*, 840 F.3d at 308. "A benefit is denied if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave." *Id.*

The FMLA requires an employer to reinstate an employee who returns from FMLA leave to her previous position or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1)(A) and (B).  An "equivalent position" is one that is "virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status.  It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  *Callaway v. Acad. of Flint Charter Sch.*, 904 F. Supp. 2d 657, 667 (E.D. Mich. 2012) (citation omitted).

Plaintiff does not claim that she was denied time off under the FMLA.  Rather, according to Defendants, the "sole basis for [Plaintiff's] interference and retaliation

claims is that she was not returned to her position after her leave and her employment ended when her leave ended." (Defs.' Mot. at p. 18, PgID 115.)  Defendants argue, however, that Plaintiff's "end date of employment had been contemplated and discussed when she informed MacArthur that it was time for her to leave the company and she was looking for other employment in May 2017." (*Id.*)  She signed off on the 90-day transition plan and end of employment date in June 2017, and when her replacement was hired in October 2017, the April 1, 2018 end date was agreed upon by van den Boogaart and Plaintiff. (*Id.*)  The April 1, 2018 end date was confirmed again in the written transition plan on January 11, 2018. (*Id.*)  Defendants contend that all of these "communications and plans … took place before MacArthur proactively offered Plaintiff FMLA leave on January 25, 2018." (*Id.*)  Defendants then conclude that Plaintiff "cannot point to any evidence that Defendants interfered with her rights under the FMLA" and they are entitled to summary judgment on Plaintiff's FMLA interference claim.  (*Id.* at pp. 18-19, PgID 115-16.)

Plaintiff responds that Defendants admit that they terminated her employment "exactly and at the same time that Plaintiff's FMLA leave ended."  (Pl.'s Resp. at pp. 11-12, PgID 292-93.)  Specifically, Plaintiff points to an April 13, 2018 email from Kim Edwards, in which Edwards wrote:

Hi Jennise,

Sorry for my delay in responding.

Your doctor's certification indicates that your leave runs through April 16, 2018. It is our understanding that you will be on leave on the 16th and have not been released back to work. **Per Jack van den Boogaart's letter to you dated February 2, 2018, should your leave end earlier, the termination of your employment will coincide with the end of your leave.** Therefore, if you have been released to return to work on April 16, your employment will [sic] MacArthur will end that day and there is no need to report to work.

Have a good day!

Kim

(*Id.*, citing ECF No. 17-15, April 13, 2018 Email, PgID 457 (emphasis added).)

Plaintiff asserts: "For 'temporal proximity' purposes, you cannot get closer in time that that!" (Pl.'s Resp. at p. 12, PgID 293.) She continues that Defendants gave her a "direct order – on two separate occasions" that Plaintiff should not report to work (*Id.* citing ECF Nos. 17-11, 17-15), and that "[t]rue to this threat, Plaintiff never returned to work for Defendants after 4/16/18, which is exactly when her FMLA ended." (*Id.*)

In its Reply brief, Defendants argue that, pursuant to 29 U.S.C. § 2614(a)(3)(B), an employee is not entitled to reinstatement of a position to which she would not have been entitled had she never taken leave. (Defs.' Reply at pp. 1-2, PgID 498-99.) According to Defendants, "[t]he unrebutted evidence in the instant

case shows that the decision to terminate Plaintiff's employment and replace her predated her January 26, 2018 request for FMLA leave," and thus, pursuant to 29 U.S.C. § 2614(a)(3)(B), MacArthur was not required to reinstate Plaintiff when her leave ended because "[h]er employment was scheduled to end on April 1, 2018 before, and regardless of, her leave." (*Id.* at p. 3, PgID 500.)  Defendants argue that Plaintiff "creates a 'false and phony' narrative to direct attention away from the June 14, 2017 meeting and the signed notes by Plaintiff" and "takes out of context the 'no concrete plans' note." (*Id.*)

The right to non-interference with medical leave is not absolute, and "the mere occurrence of interference with an employee's FMLA rights is not a per se FMLA violation." *Verkade v. United States Postal Serv.*, 378 F. App'x 567, 575 (6th Cir. 2010).  Pursuant to 29 U.S.C. § 2614(a)(3)(B), no employee is entitled to "any right, benefit, or position of employment other than … [that] to which the employee would have been entitled had the employee not taken the leave."  More specifically, "[a]n employee returning from FMLA leave is not entitled to restoration unless he would have continued to be employed if he had not taken FMLA leave." *Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008).  As explained in *Arban v. West Publishing Corporation*, 345 F.3d 390 (6th Cir. 2003):

> The substantive right to reinstatement provide in § 2614(a)(1), however, "shall [not] be construed to entitle any restored employee to

31

> … any right, benefit, or position of employment other than any right,
> benefit or position to which the employee would have been entitled had
> the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).
> Similarly, the right to non-interference with medical leave also is not
> absolute.  "[A]n employee who requests FMLA leave would have no
> greater protection against his or her employment being terminated for
> reasons not related to his or her FMLA request than he or she did before
> submitting that request." *Gunnell v. Utah Valley State Coll.*, 152 F.3d
> 1253, 1262 (10th Cir. 1998).  An employee lawfully may be dismissed,
> preventing him from exercising his statutory rights to FMLA leave or
> reinstatement, but only if the dismissal would have occurred regardless
> of the employee's request for or taking of FMLA leave.  *Id.*

345 F.3d at 401.  *See also Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 245 (6th

Cir. 2004) ("An employee returning from FMLA leave is not entitled to restoration

unless he would have continued to be employed if he had not taken FMLA leave.");

*O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1354 (11th Cir. 2000)

("We hold that when an 'eligible employee' who was on FMLA leave alleges her

employer denied her FMLA right to reinstatement, the employer has an opportunity

to demonstrate it would have discharged the employee even had she not been on

FMLA leave.").  Thus, an employer is not precluded from terminating an employee

who has requested or taken FMLA leave, so long as the employee's exercise of

FMLA rights is not a factor in the employer's decision to take action against the

employee.  *See Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 408 (6th Cir. 2003)

("If the employee cannot show that he was discharged because he took leave – or at

32

least that his taking of leave was a 'negative factor' in the employer's decision to discharge him – he cannot show a violation of the FMLA.").

In this case, Plaintiff argues that a material factual dispute exists as to whether she resigned from MacArthur and whether she trained a replacement because she was leaving the company, as opposed to training the replacement so that she could take another job within the company. (Pl.'s Resp. at p. 22, PgID 303.) Plaintiff does not dispute, however, that she informed her supervisor, van den Boogaart, on May 5, 2017 in an email that "it seems that the time has come and I need to seriously consider other employment." (5/5/17 Plaintiff Email, PgID 212.) In a follow up meeting later that month, van den Boogaart offered Plaintiff a retention bonus if she would agree to stay to train her replacement, which she declined. (Van den Boogaart Dep. at pp. 8-9, PgID 182; Plaintiff Dep. at pp. 124-26, PgID 157-58.) Plaintiff also does not dispute that she signed the June 14, 2017 "Talking Points" document which provided, in relevant part, that:

- "On May 5, 2017 Jennise sent email to supervisor that she was giving 'heads up' she will be leaving position."

- Plaintiff was given a "verbal offer of retention bonus to stay until year end which Jennise declined."

- "By giving notice of seeking other employment prior to the end of 2017, Jennise understands she is giving notice of her ~~intention to quit~~ [intention to look elsewhere] her position and the Company will begin the search for a replacement as of today. **She understands that, with**

33

**the exception of an initial training period, the Company cannot be expected to maintain two people in the same job opening and we will accept her resignation at that time.** The initial training period will not exceed 90 days from the start date of a replacement."

(6/14/17 Talking Points, PgID 219-20 (emphasis added).) Plaintiff signed her name under the statement: "These notes are accurate and complete for the meeting between Jennise and Wendi (HR) on the date stated above." (*Id.* at PgID 220.)[1] She also does not dispute that she met with van den Boogaart before MacArthur extended an offer to her replacement in October 2017, and that April 1, 2018 was discussed as the proposed end date of Plaintiff's employment. (Plaintiff Dep. at pp. 136-38, 144, PgID 160-62; Plaintiff 1/18/18 Email, PgID 229.)[2] On January 11, 2018, Lloyd

---

[1] Plaintiff confirmed, in her January 12, 2018 email to Lloyd, that Lloyd "allowed [Plaintiff] to review the [June 14, 2017] document, identify inaccuracies and then hand-write the corrections." (ECF No. 17-5, 1/12/18 Plaintiff Email, PgID 327.)

[2] Plaintiff agrees that she met with van den Boogaart before MacArthur extended an offer to her replacement, and that April 1, 2018 was discussed as the proposed end date of Plaintiff's employment. (Plaintiff Dep. at pp. 136-38, 144, PgID 160-62; Plaintiff 1/18/18 Email, PgID 229.) However, Plaintiff disputes that she agreed to resign effective April 1, 2018, but rather contends that she stated that she did not have any intention to quit at that time. She believed she would instead transition into a new position created by the departure of another employee, co-owner Nicole Barrett. (Plaintiff Dep. at pp. 138-39, 143-PgID 161.) Whether this could create a disputed issue of fact as to Plaintiff's understanding at that point in time, Defendants made clear again on January 11, 2018 (before Plaintiff's FMLA leave) that it would accept Plaintiff's resignation of employment on April 1, 2018 (1/11/18 Transition Plan, PgID 225), and Plaintiff confirmed that she knew as of January 16, 2018 that this new role was not an option. (1/18/18 Plaintiff Email, PgID 229.)

presented Plaintiff with the written transition plan "for the 90-day training period" for Plaintiff's replacement, unambiguously stating that "[a]t the end of the training period on April 1, 2018, Mac Arthur will accept your resignation of employment as discussed during our conversation on June 14th."  (1/11/18 Letter, PgID 225.) Finally, Plaintiff wrote that Defendants again confirmed this April 1, 2018 termination date on January 23, 2018.  (1/23/18 Plaintiff Email, PgID 227.)

The issue is whether Plaintiff's termination date was set before she requested FMLA leave, and thus whether she would have been terminated regardless of her leave.  Defendants have presented summary judgment evidence that they accepted Plaintiff's resignation and determined her end date of employment before she requested leave, and that Defendants had in fact already hired Plaintiff's replacement prior to her requesting leave.  That Plaintiff subsequently informed them that she was not resigning does not change that fact, or render her termination, at the end of her FMLA leave, a violation of the FMLA.

There is no direct evidence in the record to support the argument that Defendants' decision to terminate Plaintiff was related to her FMLA leave.  In fact, Defendants agreed to extend Plaintiff's previously set termination date to April 17, 2018, "or until such time as your leave ends," so that she could take her full leave. (2/2/18 van den Boogaart Letter, PgID 216,)  Viewing the evidence in the light most

35

favorable to Plaintiff, while Plaintiff disputes that she resigned, and she may not have given a "time line to remain in her position" and had "no concrete plans" regarding *when* she would leave, the undisputed evidence demonstrates that MacArthur set her end date of employment as April 1, 2018 *before* she requested and took FMLA leave and thus that she was not entitled to reinstatement to her position following her FMLA leave. *See Ahmarani v. Sieling & Jones, Inc.*, 211 F. Supp. 2d 658, 660-61 (D. Md. 2002) (holding employer did not violate the FMLA because it made the decision to terminate the plaintiff, and in fact had already begun interviewing for a replacement, before he requested FMLA leave, even though the exact date for plaintiff's termination may not have been set when he requested leave); *Patterson v. Alltel Info. Serv., Inc.*, 919 F. Supp. 500, 505 (D. Me. 1996) (finding the evidence undisputedly showed that defendant had made the decision to replace plaintiff three weeks prior to the request for FMLA leave and that "only the timing of the final decision to replace him is relevant" to the interference claim, regardless of when the decision was implemented).[3]

---

[3] The case Plaintiff relies on in her Response brief, *Russell v. Bronson Heating and Cooling*, 345 F. Supp. 2d 761 (E.D. Mich. 2004) (Borman, J.) is distinguishable. In that case, the plaintiff was on "partial leave" following her delivery of her baby. *Id.* at 769. Defendants terminated plaintiff's employment as a bookkeeper days before she was scheduled to resume full time employment for poor performance, including "some glaring problems and some imbalances" in defendant's books, and plaintiff's alleged failure to pay state taxes and properly pay Union benefits. *Id.* Plaintiff

Based on the present record, a reasonable jury could reach only one conclusion: Defendants had already decided Plaintiff's last date of employment before she requested leave, and had in fact hired her replacement, who she helped to train, months before she requested leave. For this reason, Plaintiff was not entitled to be restored to her previous position and Defendants' motion for summary judgment on Plaintiff's FMLA Interference claim (Count I) is GRANTED. *See Ahmarani*, 211 F. Supp. 2d at 661 (collecting cases holding employee not entitled to reinstatement because the decision to terminate him had been made before he requested leave).

### 2.      FMLA Retaliation claim

Plaintiff also brings a claim of FMLA retaliation. To establish a prima facie case of FMLA retaliation, Plaintiff must show that (1) she was engaged in an activity protected by the FMLA; (2) Defendants knew that she was exercising her rights under the FMLA; (3) after learning of her exercise of FMLA rights, the Defendants took an employment action adverse to her; and (4) there was a causal connection

---

presented summary judgment evidence disputing those allegations. *Id.* at 770. The Court thus found that the plaintiff established enough evidence to survive summary judgment on her FMLA interference claim. *Id.* at 780. Contrary to Plaintiff Noel's assertion, the *Russell* case was not decided "on facts very similar to the facts or our case." While Plaintiff Noel was not reinstated to her previous position, the reason is that Defendants had accepted her resignation and set the end date of her employment prior to her requesting FMLA leave.

between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2013). If Plaintiff makes that showing, the burden shifts to Defendant to offer evidence of a legitimate, non-discriminatory reason for the adverse employment action. And if Defendant succeeds, the burden shifts back to Plaintiff to show that Defendant's proffered reason is a pretext for unlawful discrimination. *Id.* To prove the proffered reason was pretext, Plaintiff must show that the proffered reason (1) has no basis in fact, (2) did not actually motivate Defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000).

As discussed above, Defendants contend that "Plaintiff's sole basis for her interference and retaliation claims is that she was not returned to her position after her leave and her employment ended" but that "Plaintiff and MacArthur contemplated and regularly discussed [Plaintiff's] desire to end her employment and agreed upon the April 1, 2018 end date – well in advance of her [January 25, 2018] FMLA leave." (Defs.' Mot. at pp. 16-17, PgID 113-14.) Defendants then argue, without any further discussion, that Plaintiff "is unable to establish a causal connection between her end of her employment and her FMLA leave." (*Id.* at p. 18, PgID 115.)

As explained above, Defendants have presented conclusive summary judgment evidence that they made the decision to end Plaintiff's employment on April 1, 2018, well before it she requested and took FMLA leave. Defendants notified Plaintiff in writing in June 2017 that in response to Plaintiff's notice of seeking other employment that MacArthur would begin the search for her replacement and that it would accept Plaintiff's resignation after the replacement was hired and trained, because it could not maintain two people in the same job opening. (6/14/17 Talking Points, PgID 219-20.) Plaintiff signed that document indicating that the "notes are accurate and complete for the meeting between Jennise and Wendi (HR) on the date stated above" (*Id.*) Plaintiff's replacement was hired in late October 2017 and Plaintiff's end date of employment was set at April 1, 2018. (2/2/18 van den Boogaart Letter, PgID 215-16; Plaintiff Dep. at p. 144, PgID 162.) That April 1, 2018 termination date was confirmed in January 2018, before Plaintiff's FMLA leave. (1/11/18 Transition Plan, PgID 225.) Defendants then extended the end date to allow Plaintiff to take her full FMLA leave. (2/2/18 van den Boogaart Letter, PgID 215-17.)

Plaintiff contends that she has established a prima facie case of FMLA retaliation because she: (1) engaged in "protected activity" by requesting and taking FMLA leave; (2) suffered a "materially adverse employment action" because her

employment was terminated; and (3) the causal connection is established because her employment was terminated at the very same time her FMLA leave expired, thereby establishing temporal proximity. (Pl.'s Resp. at pp. 13-14, PgID 294-95.) Plaintiff argues that evidence of temporal proximity together with a showing of displeasure and/or anger by Defendants due to Plaintiff taking FMLA leave establishes a causal connection. (*Id.*)

However, "[n]o FMLA violation occurs where an employer has already decided to terminate the employee before the employee requests FMLA leave." *Kennebrew v. N.Y. City Hous. Auth.*, No. 01 CIV 1654 (JSR) (AJP), 2002 WL 265120, at *19 (S.D.N.Y. Feb. 26, 2002) (citations omitted); *see also Beno v United Tel. Co. of Fla.*, 969 F. Supp. 723, 726 (M.D. Fla. 1997) ("Before [plaintiff] requested medical leave, her supervisors had already … recommended her termination. Thus, [plaintiff's] allegation of pretext – that she was terminated because of her request for medical leave – is undermined by the undisputed fact that [the employer's] steps toward termination were already underway before [plaintiff] requested leave," and thus she did not establish a prima facie case for an FMLA violation).[4] "[T]emporal proximity is insufficient in and of itself to establish that the

---

[4] Similarly, the "evidence" of "displeasure and/or anger" Plaintiff points to in her response brief occurred *prior to* the protected activity here – her FMLA leave. For example, Plaintiff alleges that "van den Boogaart was displeased with the fact that

40

employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) (citations omitted). "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002) (citations omitted).

Facing a similar issue, another court in this district explained:

> In order to establish a causal link, Plaintiff must establish that his employer had knowledge of his protected activity **when it made the decision to discharge him**; without knowledge of the protected activity, there can be no inference that the adverse action was taken because of the protected activity. *See Wade*, 259 F.3d at 463 (prima facie case of retaliation requires showing that employer was aware of protected activity); *Strouss v. Mich. Dep't of Corrections*, 75 F.

---

she needed and was taking FMLA leave." (Pl.'s Resp. at p. 14, PgID 295.) As explained above, the decision to terminate Plaintiff's employment was made before she took leave. To the extent Plaintiff is referring to her work accommodation wherein she was continuously permitted to work from home Mondays and Fridays, and then to work remotely from Ann Arbor every other Friday, there is nothing in the record that the accommodation ever was, or even could be, designated as "FMLA leave" as opposed to a work accommodation. Plaintiff also points to evidence that she disputes resigning, pointing to January 18th and 23rd, 2018 emails in which she states that she was not resigning and/or quitting. She also points to evidence in June 2017 that Defendant acknowledged that Plaintiff had "no concrete plans" regarding how long she would remain in her position and "no time line to remain in her position," (6/14/17 Talking Points, PgID 219-20; Lloyd Dep. at p. 37, PgID 205), and acknowledged that Plaintiff disputes resigning from her position. (1/16/18 Lloyd Email, PgID 231.) This "evidence" – all predating Plaintiff's FMLA leave – is not relevant to showing that Defendants retaliated against her *because of* that leave.

Supp.2d 711, 727 (E.D. Mich. 1999) ("Since the decision to transfer Plaintiff [the adverse employment action] actually predates Plaintiff's complaints to her supervisor about Dr. Givens [the protected activity], clearly no causal nexus exists between those complaints and her transfer…."); *see also Gregory v. Texas Youth Commission*, 111 Fed. Appx. 719, 721, 2004 WL 2244241, at *2 (5th Cir. 2004) (no causal link established when employer "designated as interviewers two panelists who testified under oath that they were not aware of [the plaintiff's] previous protected activity *when they made the promotion decision* [and the plaintiff] did not present evidence to the contrary.") (emphasis added).

*Smith v. ACO, Inc.*, 368 F. Supp. 2d 721, 732-33 (E.D. Mich. 2005) (emphasis added).

Here, as explained above, it is undisputed that Defendants made the decision to terminate Plaintiff's employment <u>before</u> Plaintiff requested or was offered FMLA leave, and accordingly Plaintiff has not carried her burden of proving a causal link between her protected activity and the adverse employment action.  The fact that the decision to terminate Plaintiff was made before she had requested or been offered FMLA leave necessarily means that the FMLA leave could not have been a factor in the decision.  *See Patterson*, 919 F. Supp. at 505 ("Because Patterson lost his Account Manager position before he even requested leave, his leave could not have caused him to lose his Account Manager position.").  Accordingly, Defendants' motion for summary judgment on Plaintiff's FMLA Retaliation claim (Count II) is GRANTED.

42

**B.     ADA Claim**

Plaintiff alleges in her Complaint that Defendant MacArthur "harass[ed]" Plaintiff, "'perceive[ed] and/or regard[ed]" her as disabled and denied her work and/or employment opportunities based on this "wrongful perception," refused to accommodate her, and terminated her in violation of the ADA.  (Compl., Count III, ¶¶ 48-55, PgID 9-10.)[5]

> The ADA provides that:
>
> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  An employee may prove disability discrimination using the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): "the employee has the initial burden of establishing his prima facie case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be

---

[5] In her response to Defendants' Motion for Summary Judgment, Plaintiff appears to limit her claim under the ADA, or at least her argument, to an alleged refusal to continue to accommodate her disability, which accommodation Defendants had done for years.  (See Pl.'s Resp. at pp. 17-22, PgID 298-303.)

pretextual." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014).

To make out a prima facie case of discrimination under the ADA, the plaintiff must establish by a preponderance of the evidence that: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) she suffered an adverse employment action because of her disability. *Id.* The plaintiff's disability must be a "but for" cause of the adverse employment action. *Id.*

To establish a prima facie failure-to-accommodate claim, the plaintiff must show that: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified for her position, with or without reasonable accommodation; (3) defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) defendant failed to provide the necessary accommodation." *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018).

Plaintiff asserts that she suffers from lupus and necrotizing myopathy, which "substantially limits one or more major life activities." Neither party disputes that Plaintiff here is disabled within the meaning of the ADA. Defendants instead argue that Plaintiff cannot establish a prima facie case under the ADA because she is not "otherwise qualified" to perform the essential functions of her position and she

44

cannot show that she was terminated because of her disability.  (Defs.' Mot. at pp.

19-20, PgID 116-17.)  Defendants further argue that Plaintiff has no evidence of

pretext to overcome MacArthur's legitimate, nondiscriminatory business reason for

her termination, and that she cannot establish a prima facie claim of failure to

accommodate because she is not otherwise qualified and she was granted all

requested accommodations.  (*Id.* at pp. 20-23, PgID 117-20.)

### 1.    Whether Plaintiff is "Otherwise Qualified"

Common to both a claim of discrimination and a failure to accommodate is

the plaintiff's burden to prove that she was "otherwise qualified" for her position.

Defendants argue that Plaintiff's statements in her application for Social

Security disability income ("SSDI") benefits that she is unable to work preclude her

from establishing that she was "otherwise qualified" to perform the essential

functions of her position.  (Defs.' Mot. at pp. 19-20, PgID 116-17.)  Plaintiff

responds that she only applied for SSDI because her long-term disability carrier

required her to, and that she has "a good explanation for why she makes an ADA

claim, and at the same time has an application for Social Security Disability benefits"

in that "she could, in fact, do her job at Defendant Employer, if only they

accommodated her as they did for six years in a row."  (Pl.'s Resp. at pp. 19, 21,

PgID 300, 302.)

In support of their argument that Plaintiff cannot establish she is otherwise qualified because of her representations to the SSA, Defendants cite *Stallings v. Detroit Public Schools*, 658 F. App'x 221 (6th Cir. 2016), for stating that "plaintiff's claims are foreclosed by her failure to explain the discrepancy between her application for disability benefits, which declares that she is incapable of working, and the contrary assertion implied in her discrimination claims—that she *is* capable of performing essential functions of a classroom teacher." (Defs.' Mot. at pp. 19-20, PgID 116-17, citing *Stallings*, 658 F. App'x at 225.) According to the Sixth Circuit in *Stallings*, "[w]ithout an explanation resolving this contradiction, plaintiff cannot demonstrate that she is 'an otherwise qualified individual.'" *Id.*

Contrary to Defendants' contention that Plaintiff is essentially estopped from bringing her ADA claim because she sought SSDI benefits, the Supreme Court has rejected this argument in *Cleveland v. Policy Management Systems Corporation*, 526 U.S. 795, (1999), stating: "[P]ursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." 526 U.S. at 797. As the Supreme Court explained in *Cleveland*, the two inquiries are distinct, "and there are … many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." *Id.* at 803 (observing, for example, that the SSA's disability determination does not take into account the possibility of reasonable

46

accommodation.)  Rather, as another court in this district explained, "[a] plaintiff can survive summary judgment by explaining that she can perform the essential functions of her position with a reasonable accommodation – 'a consideration the Social Security Administration's (SSA) disability determination does not take into account.'"  *Peters v. University Bank*, No. 16-12066, 2018 WL 1570630, at *6 (E.D. Mich. Mar. 30, 2018) (Hood, C.J.) (citing *Stallings*, 658 F. App'x at 226); *see also Cleveland*, 526 U.S. at 806 (holding "that an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation.").

Here, Plaintiff has explained in her Response that "the only reason [she] applied for Social Security Disability benefits was because her long-term disability carrier required her to" and "she could, in fact, do her job at Defendant Employer, if only they accommodated her as they did for six years in a row."  (Pl.'s Mot. at pp. 19, 21, PgID 300, 302, citing ECF No. 17-21, Affidavit of Jennise Samuels Noel.) She continued that she did her job for six years in a row, with accommodation, and received good evaluations and "pay raises for exemplary work," without any "undue hardship" to Defendants.  (*Id.* at p. 21, PgID 302.)  Plaintiff has thus provided a sufficient explanation as to how she can perform her job with reasonable accommodation.  Indeed, Defendants concede that Plaintiff "performed her job well"

and that she was terminated only because she resigned and it had hired a replacement for her position, not that she could not satisfactorily perform her job. (Defs.' Mot. at p. 20, PgID 117.) Thus, Defendants' argument that Plaintiff was not "otherwise qualified" based on her SSDI application is rejected. *See Peters*, 2018 WL 1570630, at *6 (finding a genuine issue of material fact regarding whether plaintiff, who applied for SSDI, is "otherwise qualified" because she proffered evidence that she can perform the essential functions of her job with a reasonable accommodation).

## 2.   Whether Plaintiff has Demonstrated Pretext

Defendants next argue that even if Plaintiff can establish a prima facie case of disability discrimination, MacArthur is entitled to summary judgment because Plaintiff cannot establish that MacArthur's legitimate, nondiscriminatory reason for ending her employment – that her notice to the company that she was seeking other employment resulted in the hiring of her replacement, with her full knowledge and approval, resulting in her resignation – was pretextual. (Defs.' Mot. at pp. 20-22, PgID 117-19.) According to Defendants, Plaintiff relies on nothing more than "her own subjective belief" that van den Boogaart did not increase her pay and that her employment ended because he did not like her accommodated schedule. (*Id.*)

Plaintiff does not respond to this argument in her Response brief, and instead only addresses her ADA failure-to-accommodate claim, discussed below.

48

Plaintiff's failure to address this argument in her response constitutes a waiver of any argument she may have. *See Pientack v. JPMorgan Chase Bank, N.A.*, No. 12-12435, 2013 WL 5372880, at \*6 (E.D. Mich. Sept. 25, 2013) ("Courts in this district have deemed counts dismissed if the plaintiff fails to respond to arguments made in a dispositive motion.") (citing *Schull v. CitiMortgage, Inc.*, No. 11-15643, 2012 WL 4498498, at \*4 (E.D. Mich. Sept. 28, 2012) (dismissing two counts of a complaint as waived because "[a] party waives opposition to a motion if the party fails to respond to arguments raised in the motion.")); *Ritchie v. Coldwater Comm. Sch.*, 947 F. Supp. 2d 791, 825 (W.D. Mich. 2013) ("Ritchie's failure to address Defendants' governmental immunity argument in his response constitutes a waiver of any argument he may have.") (citations omitted).  In any event, a review of the record evidence reveals that Plaintiff cannot establish pretext, and that her disability was the "but for" reason for her termination, and Defendants are entitled to summary judgment on the merits of Plaintiff's ADA discrimination claim as well.

An employee bringing an ADA claim can show pretext by offering evidence that an employer's stated reason for termination (1) had no basis in fact, (2) did not actually motivate its decision, or (3) was never used in the past to discharge an employee. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998) (citation omitted).  The pretext issue in this case is whether Defendants' stated reason for

discharging Plaintiff actually motivated the decision to terminate her employment. As detailed above, Defendants have provided ample summary judgment evidence demonstrating that Plaintiff's employment ended because she, in her own words, gave notice to MacArthur that she "need[s] to seriously consider other employment" and that it was her "intention to look elsewhere" for employment, which resulted in the recruiting and hiring of her replacement (with her knowledge and approval) and the subsequent end of her employment with MacArthur. That Plaintiff later asserted that she did not intend to resign fails to demonstrate that Defendants' reason for her termination had no basis in fact or was otherwise pretextual in light of the evidence above. Plaintiff otherwise offers nothing more than her subjective belief that Defendants harbored discriminatory animus based on her disability, which they had accommodated for years before she had indicated her intention to seek employment elsewhere. An isolated inquiry by van den Boogaart in early 2017 into Plaintiff's schedule accommodation fails to demonstrate any discriminatory animus or other establish pretext. Van den Boogaart testified with regard to Plaintiff's modified work schedule that no employees complained about Plaintiff's modified work schedule and that Plaintiff sufficiently completed her work with that schedule, and that he in fact gave Plaintiff good evaluations for her performance in 2016 and 2017. (van den Boogaart Dep. at pp. 36-37, 42-43, PgID 189, 191.) Plaintiff pointed out

elsewhere in her response that one day after notifying Defendant that she needed an accommodation so that she could undergo treatment, she received a letter from Lloyd stating that she would resign April 1, 2018.  (Plaintiff 1/18/18 Email, PgID 230.)  However, as explained above Plaintiff admits that she was readily granted that accommodation, that the April 1, 2018 termination date had been communicated to her months before she requested the accommodation, and that she has no evidence that Lloyd was even aware of that accommodation request when she sent the January 11, 2018 transition plan letter to Plaintiff.  (Plaintiff Dep. at pp. 149-52, PgID 163-64.)

Thus, to the extent Plaintiff brings an ADA discrimination claim (as opposed to only a failure-to-accommodate claim under the ADA as argued in her response brief), Defendants' motion for summary judgment on that claim is GRANTED.

### 3.    Plaintiff's Failure-to-Accommodate Claim

Plaintiff's arguments in support of her ADA claim in Response brief focus solely on whether Defendants violated her rights under the ADA by refusing to continue to accommodate her.  (Pl.'s Resp. at pp. 17-22, PgID 298-303.)  The ADA defines the term "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability" unless the employer "can demonstrate that the accommodations would

impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A). Unlike a disability discrimination claim premised on a wrongful termination theory, the burden-shifting framework set forth in *McDonnell Douglas* does not apply to a failure-to-accommodate theory. *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018). Instead, ADA discrimination "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id.* (citation omitted.)

As set forth above, to establish a prima facie failure-to-accommodate claim, the plaintiff must show that: (1) she is disabled within the meaning of the ADA; (2) she is otherwise qualified for her position, with or without reasonable accommodation; (3) defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) defendant failed to provide the necessary accommodation." *Brumley*, 909 F.3d at 839. Plaintiff "bears the initial burden of proposing an accommodation and showing that the accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007).

Defendants contend that MacArthur granted every request by Plaintiff for an "accommodation." (Defs.' Mot. at pp. 22-23, PgID 119-20.) Specifically, Defendants assert that it is undisputed that Plaintiff was permitted to work remotely on Mondays and Fridays since 2010, and then work remotely from Ann Arbor every

other Friday, and that there were no issues with Plaintiff's performance.  (*Id.* at p. 23, PgID 120.)  Defendants contend that there is no evidence that Plaintiff requested any other alleged accommodations and her failure-to-accommodate claim therefore fails.

Plaintiff agrees in her response that Defendants "granted her request for an accommodation by allowing the accommodate[ion] for six years in a row!"  (Pl.'s Resp. at p. 18, PgID 299.)  She argues, however, that "Defendants deliberately choose [sic] to terminate Plaintiff's employment instead of allowing her to continue working with an accommodation."  (Pl.'s Resp. at p. 19, PgID 300.)

Plaintiff fails to offer, as is her burden, any evidence that she proposed or requested any accommodation that was not granted.  *Aldini v. Kroger Co. of Michigan*, 628 F. App'x 347, 350-51 (6th Cir. 2015) (noting that the employee bears the burden of requesting a reasonable accommodation and thus if the employee does not propose an accommodation, her claim generally must fail.)  Rather, she simply asserts that she should have been allowed to continue working with the accommodations that had been granted.  Plaintiff fails to present any summary judgment evidence that Defendants failed to reasonably accommodate her and Defendants are entitled to summary judgment on Plaintiff's her ADA failure-to-accommodate claim.  *Blazek v. City of Lakewood*, 576 F. App'x 512, 517-18 (6th

Cir. 2014) ("Plaintiff's claim fails on the ground that he did not request *any* accommodation from Defendant prior to his termination.").

## IV.   CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendants' Motion for Summary Judgment (ECF No. 15).

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
United States District Judge

Dated: June 26, 2020

54